920 P.2d 31

William J. FOY, Plaintiff–Appellee,

v.

Stella THORP, a married woman, Defendant–Appellant.

No. 1 CA–CV 95–0233.

Court of Appeals of Arizona, Division 1, Department E.

June 20, 1996.

Reconsideration Denied July 16, 1996.

Roshka Heyman & DeWulf, PLC by John E. DeWulf and Paul J. Roshka, Jr., Phoenix, for Plaintiff–Appellee.

Byrnes & Himelrick by Richard G. Himelrick, Scottsdale, and Law Offices of Robert D. Mitchell, P.C. by Robert D. Mitchell, Scottsdale, for Defendant–Appellant.

## OPINION

VOSS, Judge.

Stella Thorp appeals from the trial court's order staying an arbitration proceeding she initiated with the National Association of Securities Dealers (NASD) against William Foy. Holding the trial court correctly found the dispute does not come within NASD's arbitration provisions, we affirm.

### Facts and Procedural History

The defendant, Stella Thorp, received an inheritance consisting of a ranch in Texas and certain oil and gas royalties. She was unsophisticated in investment and financial matters. In 1981, she met the plaintiff, William Foy, a financial planner and investment advisor. Foy solicited Thorp to become a client of his and of his firm, The Financial Forum.

Foy held a real estate license and a Series 6 registration with the NASD. He was affiliated with Anchor National Financial Services in Phoenix. The Series 6 NASD registration limited him to handling mutual fund transactions which, when held concurrently with a valid insurance license, permitted him to engage in variable annuity transactions.[1] Under NASD rules, Foy was an "affiliated person," which is defined as

> a sole proprietor, partner, officer, director, or branch manager of any member or any natural person occupying a similar status or performing similar functions, or any natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by such member ...

"Members" are "either any broker or dealer admitted to membership in the [National Se-

---

1. At that time, Foy had not yet qualified for a general "Series 7" securities license.

curities] Corporation or any officer or partner of such a member...."

Following Foy's advice, Thorp exchanged the Texas property and a sum of cash for real property located in Tempe, known as Broadriver Plaza. The Broadriver Plaza was owned by Foy and his partners. In the transaction, it was sold to John Lloyd, who then exchanged it for Thorp's property. Thorp paid approximately $900,000.00 for the Broadriver Plaza investment. The purchase price consisted of $540,000.00 in cash and the assumption of an existing mortgage with Northwestern National Life. Foy was the listing broker for the transaction and received a real estate commission through The Financial Forum. Following the exchange, Foy managed the property, disbursed net operating income, and maintained the property with a view to eventual resale. Foy also arranged for Thorp to work with another principal of The Financial Forum, Nyles A. Gentry, who was properly licensed in connection with Thorp's investment of a substantial sum of money in stocks and other securities with Anchor National Financial Services.

Thorp filed a statement of claim with NASD, seeking arbitration. She alleged Foy should not have recommended the transaction to her and Foy had a conflict of interest in recommending the property for exchange because he owned other properties in the vicinity. She further alleged Foy had represented Broadriver Plaza would increase in value, but it did not. She also complained Foy managed the property poorly. However, regarding the money she invested in securities through Gentry, the statement of claim stated: "[s]he is not asserting a complaint in this arbitration regarding how that money was managed."

Foy then filed this action pursuant to Arizona Revised Statutes Annotated section (A.R.S. § ) 12–1502, seeking to have the superior court stay the arbitration. After briefing and argument the trial court granted the stay and entered its formal order. Thorp filed a timely notice of appeal. This court has jurisdiction over the appeal pursuant to A.R.S. § 12–2101.01(A)(2).

## *Discussion*

Arizona law favors arbitration, both statutorily, *see* A.R.S. § 12–1501, and by the courts as a matter of public policy. *Clarke v. ASARCO Inc.*, 123 Ariz. 587, 589, 601 P.2d 587, 589 (1979). "Notwithstanding such public policy, an arbitrator cannot resolve issues which go beyond the scope of the submission agreement." *Id.* Due to the public policy favoring arbitration, arbitration clauses should be liberally construed, and doubts regarding arbitrability should be resolved in favor of arbitration. *U.S. Insulation, Inc. v. Hilro Constr. Co.*, 146 Ariz. 250, 258, 705 P.2d 490, 498 (App.1985); *New Pueblo Constructors, Inc. v. Lake Patagonia Recreation Ass'n*, 12 Ariz.App. 13, 16, 467 P.2d 88, 91 (1970).

## I. WHO DETERMINES ARBITRABILITY?

Thorp argues the question of arbitrability should be decided initially by the arbitrators, not the court. She relies on *City of Cottonwood v. James L. Fann Contracting, Inc.*, 179 Ariz. 185, 877 P.2d 284 (App.1994). In *Cottonwood*, we held the question of the timeliness of a party's demand for arbitration should be decided by the arbitrator. *Id.* at 192, 877 P.2d at 291. However, *Cottonwood* does not support Thorp's argument; in fact, it supports the contrary position.

We noted in *Cottonwood* the issue of the timeliness of a demand for arbitration is complicated: it can constitute any of three things: (1) repudiation/waiver of the arbitration clause; (2) failure of a procedural condition; or (3) failure of a condition precedent to activation of the clause. *Id.* at 189, 877 P.2d at 288. We held issues two and three were for the arbitrator, but issue one was for the court:

> Untimeliness may constitute repudiation of the arbitration agreement if the repudiating party has acted so inconsistently with the arbitration agreement as to waive its right to proceed under the agreement.... Because repudiation calls into question the existence of the arbitration agreement, repudiation is an issue for the court.

*Id.* at 190, 877 P.2d at 289.

*Cottonwood* holds the court decides whether the parties have an agreement to

arbitrate a particular dispute. The holding flows naturally from the statute under which this suit was filed originally.

> On application, the court may stay an arbitration proceeding commenced or threatened on a showing that there is no agreement to arbitrate. Such an issue, when in substantial and bona fide dispute, shall be forthwith and summarily tried and the stay ordered if found for the moving party.

A.R.S. § 12–1502(B). Because the statute gives the court the power to try the issue of whether there is an agreement to arbitrate, and simultaneously gives the court the power to stay an arbitration proceeding that is already commenced, it necessarily gives the court the power to decide the issue in the first instance. *Cottonwood,* 179 Ariz. at 190, 877 P.2d at 289; *Clarke v. ASARCO Inc.,* 123 Ariz. at 589, 601 P.2d at 589 (*court* decided which issues arbitrator was empowered to decide).

The issue here is whether Foy has agreed to arbitrate the controversy between him and Thorp. This became an issue for the court to decide when Foy filed this action under A.R.S. § 12–1502.

## II.  SCOPE OF ARBITRABILITY

■  The NASD Code of Arbitration Procedure provides in part:

> Any dispute, claim or controversy eligible for submission under Part I[2] of this Code between a *customer* and a *member* and/or associated person arising in connection with the business of such member or in connection with the activities of such associated persons shall be arbitrated under this Code, as provided by any duly executed and enforceable written agreement or upon the demand of the customer.

NASD Code of Arbitration Procedure, § 12(a) (§ 12). The parties agree the arbitrability of Thorp's claim against Foy depends on the proper construction of the

phrase: "in connection with the business of such member or in connection with the activities of such associated persons." Thorp argues the language of the section admits of practically no limitation: the controversy is NASD-arbitrable if it arises out of the business activities of the associated person.

We agree with Foy that the section applies only to NASD-related activities of the associated person. The only cited authorities addressing this question unanimously read § 12(a) as limited to NASD-related activity. In *A.G. Edwards & Sons, Inc. v. Clark,* 558 So.2d 358 (Ala.1990), the Alabama Supreme Court was faced with the question of whether a dispute was arbitrable. The issue involved section 8 of the NASD Code (§ 8), which deals with disputes between members and/or affiliated persons *inter sese,* as opposed to § 12, which includes customers. However, like § 12, § 8 requires the controversy "aris[e] in connection with the business of such member(s) or in connection with the activities of such associated person(s)" to be arbitrable. *Id.* at 359 (quoting NASD Code of Arbitration Procedure, § 8(a)). The court held the section must be limited to NASD-related activities:

> The NASD Code does not mandate arbitration for "any claim against a member," as the defendants would have us interpret it; it mandates arbitration of any claim "arising in connection with the business" of a member or "in connection with the activities" of an associated person. The NASD Code does not define "business," but it does define "Investment banking or securities business" as "the business, carried on by a broker or dealer, of underwriting or distributing issues of securities, or of purchasing securities and offering the same for sale as a dealer therein, or of purchasing and selling securities upon the order and for the account of others...." "Member" is defined as "either any broker or dealer admitted to membership in the [National Securities Clearing] Corporation or

2.  Section 1 of Part I of the Code provides:
    This Code of Arbitration Procedure is prescribed and adopted ... for the arbitration of any dispute, claim, or controversy arising out of or in connection with the business of any member of the Association ...

> . . .
> (3) between or among members or associated persons and public customers, or others. . . .

any officer or partner of such a member...." "Person associated with a member," ... is defined as "every sole proprietor, partner, officer, director, or branch manager of any member, or any natural person occupying a similar status or performing similar functions, or any natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by such member...." Although the arbitration clauses in the NASD Code talk of "business," it is clear that all the persons that must abide by the arbitration clauses are defined in terms of participants in the "securities business." ... By its very nature, the "business" of the members of the NASD is the trading of securities, and while arbitration clauses are to be interpreted broadly, they are not limitless and cannot be interpreted to include matters that clearly fall outside the scope of the contract agreement.

*Id.* at 363.

When resolving similar questions regarding arbitrability, other courts have agreed with this line of reasoning. For example, in *Pearce v. E.F. Hutton Group, Inc.*, 828 F.2d 826 (D.C.Cir.1987), the court stated it would be unfair—because beyond the probable contemplation of the parties to the U-4 agreement—to require an associated person to submit literally any dispute arising out of his employment to arbitration, especially claims not deriving in some fashion from the occupational duties as an associated person. If an associated person slips and falls in the member firm's premises, his negligence claim against the firm raises no issues that would not also arise if a secretarial or janitorial worker has such a fall; it would be odd, therefore, if the parties intended to require the associated person to submit a dispute over such a mishap to NYSE arbitration, since the employer's membership in the NYSE is a fortuity, no more relevant to the slip-and-fall of an employee who is an associated person than to that of another employee. The phrase "arising out of my employment" is therefore more sensibly read as

"arising out of my employment as an associated person."

*Id.* at 832. *Accord Transamerica Fin. Resources, Inc. v. Rondini,* 189 Ill.App.3d 853, 137 Ill.Dec. 136, 545 N.E.2d 789 (1989) (NASD arbitration not available under § 8 for NASD member's suit to enforce loan it made to employee when it hired him); *Morgan v. Smith Barney, Harris Upham & Co.,* 729 F.2d 1163 (8th Cir.1984) (New York Stock Exchange arbitration available for some claims by former employee against NYSE member, but not for claims that office-mates had accused former employee of stealing from their desks).

We agree with this reasoning. Section 12 of the NASD Code does not require a member or associated person to arbitrate every dispute with a customer. Thorp may not obtain NASD arbitration of any dispute she might have with Foy simply because of the fortuity that he is an "affiliated person," subject to NASD's rules. Rather, NASD arbitration is only available regarding Foy's business and activities as a dealer in securities.

Thorp argues because NASD requires "[a] member, in the conduct of his business, shall observe high standards of commercial honor and just and equitable principles of trade," [3] the NASD has arbitration jurisdiction over this dispute. She cites *In re Gebura,* 46 S.E.C. 1121 (1977), and *In re Jackson,* 45 S.E.C. 771 (1975). In both of these cases, the Securities and Exchange Commission held it had disciplinary jurisdiction over the respondents, despite their arguments that the questioned conduct did not involve the trading of securities. These cases are inapposite. The disciplinary jurisdiction of an association over its members can be quite broad, for the very reason that the association is interested in maintaining the integrity, professionalism and reputation of the association, its members, and its profession. This disciplinary jurisdiction does not, however, equate to arbitration jurisdiction. The NASD may very well be interested in whether an affiliated person has defrauded a customer in, for example, selling her a used car.

---

3. NASD Rules of Fair Practice, § 1.

However, this does not give the NASD arbitration jurisdiction over that dispute.

In conclusion, the NASD rules contemplate arbitration of disputes having to do with the activity they regulate: securities transactions. Thus, unless the dispute between Thorp and Foy involves a securities dispute, the arbitration provisions of the NASD Code do not apply.

## III. IS A SECURITY INVOLVED?

■ We turn to Thorp's contention that the underlying transaction did involve Foy's NASD-related activities. Thorp relies on the NASD Rules of Fair Practice, specifically the rule regarding direct participation programs (DPP). NASD has specific rules regarding DPPs.[4] Thorp argues the Broadriver Plaza investment constituted a DPP, one specific type of security, and because NASD regulates DPPs, the Broadriver Plaza investment was an NASD-related activity.

The NASD defines a DPP thus:

Direct participation program (program)—a program which provides for flow-through tax consequences regardless of the structure of the legal entity or vehicle for distribution including, but not limited to, oil and gas programs, real estate programs, agricultural programs, condominium securities, Subchapter S corporate offerings and all other programs of a similar nature, regardless of the industry represented by the program, or any combination thereof. A program may be composed of one or more legal entities or programs

but when used herein and in any rules or regulations adopted pursuant hereto the term shall mean each of the separate entities or programs making up the overall program and/or the overall program itself. Excluded from this definition are real estate investment trusts, tax qualified pension and profit sharing plans pursuant to Sections 401 and 403(a) of the Internal Revenue Code and individual retirement plans under Section 408 of that Code, tax sheltered annuities pursuant to the provisions of Section 403(b) of the Internal Revenue Code, and any company, including separate accounts, registered pursuant to the Investment Company Act of 1940.

NASD Rules of Fair Practice, § 34(a)(2).

Thorp argues the Broadriver Plaza investment was a

real estate program under which she was to receive the property, tax deductions, and income while he managed it for her with a view to later reselling it at a profit. This was a direct, one-on-one investment in a real estate program packaged and promoted to Ms. Thorp by Mr. Foy in his capacity as her financial advisor.

(Opening Brief at 18.)

Foy responds in part the Broadriver Plaza investment could not possibly be a DPP because Thorp obtained tax breaks on the investment as a "like-kind exchange." Foy notes the Internal Revenue Code does not allow like-kind exchange status for investments involving securities. 26 U.S.C. § 1031.[5] Because Thorp benefitted from the

---

**4.** Thorp points to the following:

In recommending to a participant the purchase, sale or exchange of an interest in a direct participation program, a member or person associated with a member shall:
(i) have reasonable grounds to believe, on the basis of information obtained from the participant concerning his investment objectives, other investments, financial situation and needs, and any other information known by the member or associated person, that:
a. the participant is or will be in a financial position appropriate to enable him to realize to a significant extent the benefits described in the prospectus, including the tax benefits where they are a significant aspect of the program;
b. the participant has a fair market net worth sufficient to sustain the risks inherent

in the program, including loss of investment and lack of liquidity; and
c. the program is otherwise suitable for the participant; and
(ii) maintain in the files of the member documents disclosing the basis upon which the determination of suitability was reached as to each participant.
NASD Rules of Fair Practice, § 34(b)(3)(B).

**5.** That statute provided:

(a) **Non-recognition of gain or loss from exchanges solely in kind.—**
**No gain or loss exchanges solely in kind.—** No gain or loss shall be recognized if property held for productive use in trade or business or for investment (*not including* stock in trade or other property held primarily for sale, nor *stocks*, bonds, notes, choses in action, certifi-

tax advantage of § 1031 in the Broadriver Plaza, Foy argues "[t]he real estate transaction ... cannot, by definition, have involved securities." We reject this argument. Simply because Thorp reported the investment as a like-kind exchange and benefitted from the tax advantages thereof does not mean the exchange qualified as a like-kind exchange for any non-tax purpose.

Nonetheless, we agree with Foy that no security was involved in this transaction. The parties have provided us with no authorities to support their respective positions on whether the transaction was a DPP. Therefore, our decision is based upon the NASD definition of a DPP.

For a transaction to qualify as a DPP under the NASD definition, it must allow an investor to purchase an interest in the program entity and it must provide for flow-through tax consequences. Thorp's purchase of Broadriver Plaza fails on both grounds.

The NASD definition requires a program to be composed of one or more legal entities. Broadriver Plaza, the subject of this transaction is not a legal entity. A legal entity is something regarded as having a legal existence apart from the members composing it. *Bergstrom v. Ridgway–Thayer Co.*, 53 Misc. 95, 103 N.Y.S. 1093, 1094 (1907). Broadriver Plaza does not have a legal existence apart from Thorp. A legal entity is further defined as having a "significant existence in legal contemplation that it can function legally, be sued or sue and make decision through agents as in the case of corporations." *Louisiana Through the Dep't of Pub. Safety v. Louisiana Riverboat Gaming Comm'n*, 640 So.2d 1368, 1374 (La.App.1994), *rev'd on other grounds*, 655 So.2d 292 (1995). Broadriver Plaza is a piece of real property owned by Thorp that cannot assert rights independently of the owners of the property. Broa-

driver Plaza is not a program within the NASD's definition of a DPP.

Thorp's purchase of Broadriver Plaza also fails to provide flow-through tax consequences as required by the definition of a DPP. The concept of flow-through tax consequences describes a situation where the tax gains and losses of an entity are not recognized by that entity but instead pass to its owners or shareholders. Broadriver Plaza does not incur tax gains or losses which flow-through to Thorp. Any loss resulting from the purchase or operation of Broadriver Plaza is incurred directly by Thorp as its owner. Quite simply, no entity exists for tax consequences to flow-through to Thorp.

All of the investments within the NASD's definition of DPPs are passive ownership investments providing flow-through tax benefits to the owner. The definition envisions situations where various investors purchase interests in a program operated by a sponsor, without management input from the investors. The sponsor's management ability is a central feature of the investments and the success of the investment depends almost entirely upon the sponsor's abilities. The definition does not encompass transactions where the owner retains active control over the investment.

Thorp's purchase of Broadriver Plaza was not the purchase of a DPP. The transaction was a simple real estate transaction in which any tax benefit flowed directly to Thorp as the owner. Thorp retained control over Broadriver Plaza. She had the ability to manage the investment or hire a third party to manage it. Such a transaction falls outside the definition of a DPP.

Several Arizona cases have analyzed transactions analogous to that in the present case. *Vairo v. Clayden*, 153 Ariz. 13, 734 P.2d 110

---

cates of trust or beneficial interest, *or other securities* or evidences of indebtedness or interest) is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment.
(Emphasis added.) The statute has since been amended to read:
   **(a) Non-recognition of gain or loss from exchanges solely in kind.—**
   **(1) In general.—**No gain or loss shall be recognized on the exchange of property held

for productive use in a trade or business or for investment if such property is exchanged solely for property of like kind which is to be held either for productive use in a trade or business or for investment.
   **(2) Exception.**—This subsection shall not apply to any exchange of—
      . . .
      **(B)** stocks, bonds or notes,
      **(C)** other securities or *evidences of indebtedness or interest.* . . .

(App.1987); *Daggett v. Jackie Fine Arts, Inc.,* 152 Ariz. 559, 733 P.2d 1142 (App.1986); *Rose v. Dobras,* 128 Ariz. 209, 624 P.2d 887 (App.1981). These cases adopt a three prong test for the existence of a security in these type of transactions. They require (1) an investment of money, (2) in a common enterprise, (3) with the expectation that profits will be earned solely from the efforts of others. *Vairo,* 153 Ariz. at 17, 734 P.2d at 114; *Daggett,* 152 Ariz. at 565, 733 P.2d at 1148. There is no question Thorp invested money. However, Thorp's purchase of Broadriver Plaza fails both the second and third prongs of this test.

The present transaction does not involve a common enterprise. In Arizona, the common enterprise prong may be satisfied under either of two tests. *Vairo,* 153 Ariz. at 17, 734 P.2d at 114; *Daggett,* 152 Ariz. at 566, 733 P.2d at 1149. Horizontal commonality requires a pooling of funds collectively managed by a promoter or third party. *Vairo,* 153 Ariz. at 17, 734 P.2d at 114; *Daggett,* 152 Ariz. at 565, 733 P.2d at 1148. Vertical commonality requires a direct correlation between the success of the investor and the success of the promoter without a pooling of funds. *Vairo,* 153 Ariz. at 17, 734 P.2d at 114; *Daggett,* 152 Ariz. at 565, 733 P.2d at 1148.

Because the present transaction involved no pooling of Thorp's funds with those of Foy or other investors there is no horizontal commonality. No vertical commonality exists because there is no direct correlation between the success of Thorp and that of Foy. Foy received a standard monthly fee for his services as property manager. No common enterprise exists. Finding otherwise would lead to the absurd result of converting every property transaction involving a property management agreement into a security.

Additionally, profits from this transaction were not to be earned solely from the efforts of others. The Ninth Circuit Court of Appeals has restated this prong as whether the third party's efforts are "those essential managerial efforts which affect the failure or success of the enterprise." *S.E.C. v. Glenn W. Turner Enters., Inc.,* 474 F.2d 476, 482 (9th Cir.), *cert. denied,* 414 U.S. 821, 94 S.Ct.

117, 38 L.Ed.2d 53 (1973), *cited with approval in Rose,* 128 Ariz. at 212, 624 P.2d at 891. The efforts of a property manager generally do not determine the success or failure of a piece of commercial property.

The property's success or failure is controlled by its ability to attract tenants willing to pay rent. Although a particular property manager may marginally affect the success of commercial property, the manager's duties are generally routine, operational tasks that can be accomplished by any one of a number of competent property managers. No one property manager can be said to be essential to the success of the property. *See Glenn W. Turner Enters., Inc.,* 474 F.2d at 482. Nothing in the record supports a finding Foy was uniquely situated to manage this property. The success of the property is more likely attributable to its location, design, attractiveness, or numerous other characteristics of the property itself.

Arizona courts have recognized a major component of the third prong is the level of control retained by the investor. *Vairo,* 153 Ariz. at 18, 734 P.2d at 115; *Rose,* 128 Ariz. at 213, 624 P.2d at 891. Where the investor retains extensive control over the investment, the transaction is unlikely to be a security. *Rose,* 128 Ariz. at 212, 624 P.2d at 890. In the present case, Thorp retained a large measure of control over her investment. Thorp retained the power to manage Broadriver Plaza herself, hire a third party manager, or hire Foy to manage the property. If at any time, Thorp became dissatisfied with her choice of property managers, she had the power to fire that manager and hire a replacement. The purchase of Broadriver Plaza was not inextricably linked to the management contract. Thorp's choice of Foy as manager does not convert an otherwise simple real estate transaction into a security.

Because of the lack of a common enterprise, profits not solely dependent upon the acts of others, and the amount of control retained by Thorp, we hold this transaction does not involve a security.

### Conclusion

The controversy between Thorp and Foy does not arise out of the latter's NASD-

related activities and is therefore not arbitrable under the NASD rules.

The judgment is affirmed.

GERBER, P.J., and THOMPSON, J., concur.