Robert D. PRESS, Plaintiff,

v.

Harvey RAETHER and Janet Raether, Defendants.

No. 01–C–0331.

United States District Court, E.D. Wisconsin.

Sept. 27, 2002.

Carl Schoeppl, Schoeppl & Burke, Boca Raton, FL, Nancy J. Sennett, Foley and Lardner, Milwaukee, for Plaintiff.

David P. Lowe, Jacquart & Lowe, Milwaukee, David W. Schmidt, Lubiner & Schmidt, Cranford, NJ, for Defendant.

### DECISION AND ORDER

ADELMAN, District Judge.

Plaintiff Robert D. Press ("Press") brings this action against Harvey and Janet Raether ("the Raethers") under the Federal Arbitration Act, 9 U.S.C. §§ 1–16, seeking a declaratory judgment that the Raethers' claims against him are non-arbitrable and a permanent injunction preventing the Raethers from arbitrating such claims against him. Before me now are both parties' motions for summary judgment.

## I. JURISDICTION

The parties have not raised the issue of whether this court has subject matter jurisdiction; however, the issue merits some discussion. Press's amended complaint states that jurisdiction is based on both 28 U.S.C § 1331, because the case is brought under the Federal Arbitration Act and, thus, raises a federal question, and 28 U.S.C. § 1332, because the parties are of diverse citizenship and the amount in controversy exceeds $75,000. (R. 17 ¶ 2.)

The first asserted basis for jurisdiction fails. The Federal Arbitration Act is "neither a grant of jurisdiction nor the source of an independent federal claim arising under federal law." *Caudle v. Am. Arbitration Ass'n*, 230 F.3d 920, 922 (7th Cir. 2000) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 n. 32, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)); *see also City of Beloit v. Local 643 of Am. Fed'n of State, County and Mun. Employees*, 248 F.3d 650, 653–54 (7th Cir. 2001). Thus, the Act does not provide federal question jurisdiction. And because Press points to no alternative basis for federal question jurisdiction, § 1331 is not available.

However, diversity jurisdiction under § 1332 is available. Press is a citizen of Florida and the Raethers are citizens of Wisconsin; thus, the parties have diverse citizenship. The amount in controversy is approximately $400,000, well over the jurisdictional minimum. *See Webb v. Investacorp, Inc.*, 89 F.3d 252, 256–57 (5th Cir. 1996) (holding that the amount in controversy in Federal Arbitration Act action is amount in dispute in underlying arbitration proceeding); 13B Charles Alan Wright, et. al, *Federal Practice and Procedure* § 3569, at 172–73 (2d ed.1984) (same). Therefore, based on diversity, I have jurisdiction to hear this case and proceed to address the motions before me.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no *genuine* issue as to any *material* fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c) (emphasis added). The mere existence of some factual dispute does not defeat a summary judgment motion; "the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis deleted). For a dispute to be genuine, the evidence must be such that a "reasonable [fact-finder] could return a verdict for the nonmoving party." *Id.* For the fact to be material, it must relate to a disputed matter that "might affect the outcome of the suit." *Id.*

Although summary judgment is a useful tool for isolating and terminating factually unsupported claims, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), courts should act with caution in granting summary judgment, *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. When the evidence presented shows a dispute over facts that might affect the outcome of the suit under governing law, summary judgment must be denied. *Id.* at 248, 106 S.Ct. 2505.

The moving party bears the initial burden of demonstrating that she is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548. Where the moving party seeks summary judgment on the ground that there is an absence of evidence to support the nonmoving party's case, the moving party may satisfy her initial burden simply by pointing out the absence of evidence. *Id.* at

325, 106 S.Ct. 2548. Once the moving party's initial burden is met, the nonmoving party must "go beyond the pleadings" and designate specific facts to support each element of the cause of action, showing a genuine issue for trial. *Id.* at 322–23, 106 S.Ct. 2548. Neither party may rest on mere allegations or denials in the pleadings, *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505, or upon conclusory statements in affidavits, *Palucki v. Sears, Roebuck & Co.,* 879 F.2d 1568, 1572 (7th Cir.1989). In considering a motion for summary judgment, I may consider any materials that would be admissible or usable at trial, including properly authenticated and admissible documents. *Woods v. City of Chi.,* 234 F.3d 979, 988 (7th Cir.2000).

I must draw all inferences in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, it is "not required to draw every conceivable inference from the record—only those inferences that are reasonable." *Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991).

The fact that both parties have moved for summary judgment, and thus both parties simultaneously are arguing that there is no genuine issue of fact, does not establish that a trial is unnecessary or empower me to enter judgment as I see fit. *See* 10A Charles Alan Wright et al., *Federal Practice and Procedure,* § 2720, at 327–28 (3d ed.1998). I may grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law on the basis of the material facts not in dispute. *See Mitchell v. McCarty,* 239 F.2d 721, 723 (7th Cir.1957). Cross motions for summary judgment do not convert a dispute into a question of law if material factual questions are involved and additional evidence may be adduced at trial

which would be helpful in the disposition of the case. *See M. Snower & Co. v. United States,* 140 F.2d 367 (7th Cir.1944). The proper procedure is to assess the merits of each summary judgment motion independently. Each party, as a movant for summary judgment, bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to a judgment as a matter of law. The fact that one party fails to satisfy that burden on its own motion does not automatically indicate that the opposing party has satisfied its burden and must be granted summary judgment on the other motion. *See* 10A Charles Alan Wright et al., *Federal Practice and Procedure* § 2720 at 335.

## III. FACTS AND BACKGROUND

In May 1999, the Raethers filed an arbitration complaint with the National Association of Securities Dealers ("NASD") alleging that PCM Securities, Ltd. ("PCM") and others, including Press, defrauded them of almost $400,000 by misrepresenting the risks involved in their investments, disregarding the duty of fair dealing, and manipulating the market. The arbitration complaint further alleges that these acts were not limited to an isolated broker at PCM, but were "part of a complex scheme" orchestrated by management. (R. 17 Ex. C ¶ 2.) However, at issue in the case before me is the limited question of whether Press must arbitrate these claims.

In the early 1990s, Press was the president and half-owner of Performance Capital Management Group, Inc. ("Performance Capital"), which was the general partner of PCM, a limited partnership securities broker-dealer registered with the Securities and Exchange Commission and a member of the NASD. The other half of Performance Capital was owned by Steve Edelson ("Edelson").

On April 17, 1996, Performance Capital sold its interest in PCM to Mitchell Financial Corp., owned by Robert Mitchell ("Mitchell"). However, Mitchell did not have a "Series 24" license, the grade of license needed to supervise brokers under the NASD rules. Thus, Mitchell Financial Corp. and Performance Capital entered into an agreement whereby Performance Capital would manage and supervise PCM's brokerage operations for four years. Indeed, the sale was conditioned upon the management agreement. The agreement, dated the same day as the sale, states,

> [Performance Capital], through it [sic] principal STEVE EDELSON or other [Performance Capital] representative, which shall be appointed by PCM as "Principal" of PCM for regulatory purposes, agree to use its best efforts to act in the capacity as manager to oversee the day to day operations of PCM, including compliance and personnel matters. With regard to compliance and personnel matters, [Performance Capital] shall have final decision making authority. [Performance Capital] shall also have direct supervisory control over the any offices of supervisory jurisdiction and any franchise offices of PCM.

(R. 17 Ex. B at 1.) For the sale of PCM, Performance Capital would receive $500,000, and for the management services, Performance Capital would receive $200,000 annually, plus 5% of any securities received by PCM for services rendered, and 90% of net commissions. The agreement specifically named Edelson as the person who would perform supervisory services because, unlike Press, he held a supervisory license. In accordance with the management agreement, Edelson was appointed Principle Compliance Officer of PCM.

The parties agree that after the sale, Press was no longer involved in PCM's day to day operations, but dispute the extent to which he remained involved in the company. Press states that he visited the PCM office "on an occasional basis" (R. 25 ¶ 8) and sat in on "three or four" meetings "relating to the business of PCM", (id. ¶ 10). He also states that he "may have gone to lunch ... with Mr. Edelson and other personnel of PCM [ ] on one or two occasions when compliance matters may have been discussed among other topics". (Id. ¶ 11.) He states that he cannot recall any specific conversations. However, he also states, "because Mr. Edelson was the principal compliance officer of PCM [ ] and was then an old friend and business partner, I am certain, if for some reason consulted, that I would have indicated my complete support for whatever instructions were given by Mr. Edelson to PCM [ ] personnel." (Id.)

In January 1997, Mitchell, Edelson and Press together interviewed Elliot Gayer for PCM's director of compliance position. Press states that he was present "in large measure as a personal gesture to Mr. Edelson, who was experiencing serious health difficulties at that time." (Id. ¶ 10.) He further states, "I wanted to make sure that he and the broker-dealers were going to receive the assistance that was needed from additional compliance personnel." (Id.)

After he was hired in March 1997, Gayer discovered some irregularities in the way Frank Pizzolato, the supervisor of the PCM trading desk, was managing broker trading. Gayer prepared a three-page memorandum to Edelson outlining his findings, the remedial steps needed and recommending that Pizzolato be fined $5,000, which would have triggered a report to the NASD. In response, Press and Edelson met with Gayer and told him that

they did not want to fine Pizzolato. Gayer recounts the conversation as follows:

> Both Mr. Edelson and Mr. Press were saying the same things, and they both were speaking to me in conversational fashion during that entire meeting. . . .
>
> [T]hey wanted to run a preventative compliance department and not one which fine [sic] brokers, they did not want to alienate brokers but they wanted to detect and prevent compliance issues and correct them without fining brokers.
>
> And that they were the ones who had the authority to tell me this because they were the managers of the firm, and not Mr. Mitchell . . . .
>
> And they told me that it was Performance Capital [ ] that was hired and that Performance Capital [ ] was owned by them and it was hired to conduct the management affairs of PCM Securities; so that I was speaking to the people who had the authority to make these decisions.

(Gayer Dep. at 79–80.) Pizzolato was not fined and, as a consequence of this conversation, Gayer did not recommend that any other employees be fined during his tenure as compliance officer.

The record contains other evidence of Press's dealings with PCM after the sale. Press maintained his broker registration with PCM. He conducted trades in his own account and for friends and family, but did not solicit customers. However, on July 7, 1997, he gave up his broker registration. In addition, in 1997, Press visited the offices of PCM on several occasions in order to engage PCM as underwriter for a public offering of Medley Credit Acceptance Corporation, of which he was then president.

The Raethers' business with PCM began in April 1997, when PCM broker Chris Miano ("Miano") called Harvey Raether and sold him 500 shares of "PCNI" for $2,782.50. Later the same month, Miano called Harvey Raether again to try to persuade him to open a larger account with PCM. On June 12, 1997, the Raethers wire transferred their individual retirement account valued at $300,000 to PCM. On August 26, 1997, they transferred their pension plan account valued at $253,794.31 to PCM. PCM used these funds to purchase shares of Advantage Life Products, Inc., Communication Corporation of America and First Colonial Ventures, Inc. The arbitration complaint alleges that by November 1997, the Raethers' pension plan had a value of $44,733 and their IRA had a value of $112,400, a loss of almost $400,000. The parties agree that Press had no personal dealings with the Raethers and was not responsible for directly supervising Miano.

On July 30, 1997, before the Raethers transferred their pension plan account to PCM, the License and Compliance Section of the Division of Securities of the Wisconsin Department of Financial Institutions suspended PCM's license to sell securities in Wisconsin. The license remained suspended until March 19, 1998. However, Miano and other brokers at PCM continued to conduct trades for Wisconsin customers. Miano's personal license was suspended on May 15, 1998.

In May 1999, the Raethers filed an arbitration complaint with the NASD against PCM, Miano, Mitchell, Edelson, Elliot Gayer, Frank Pizzolato and Press, among others. The arbitration complaint alleges that the respondents directly or indirectly defrauded the Raethers by engaging in unauthorized transactions using the Raethers' money and misrepresenting the risks involved. More generally, the complaint alleges that PCM created a "a boiler room environment" by "encouraging [its brokers] to disregard their duty of fair dealing to investors and to mislead investors during the offer, purchase and sale of se-

curities." (R. 17 Ex. C ¶ 2.) With regard to Press in particular, the arbitration complaint alleges,

> Robert Press was a control person at PCM Securities as well as a registered representative and agreed to exercise supervisory control and authority over the brokers and PCM[ ]. In or about 1996, Robert Press sold his interest in PCM[ ] to Robert Mitchell and simultaneously agreed to manage the firm as Robert Mitchell did not have the required licenses. In 1997, during the time that the Raethers maintained their account at PCM[ ], Robert Press acting together with Respondent Edelson had full control and supervisory responsibility over all PCM[ ] sales representatives including Chris Miano.

(*Id.* ¶ 12.) The complaint alleges that Press and the other arbitration respondents are liable under the Securities and Exchange Act, the Securities Act of 1934, common law tort theories, breach of contract, the federal RICO statute and Wisconsin securities laws.[1]

## IV. DISCUSSION

Whether a party can be forced to arbitrate a dispute depends upon whether he or she previously agreed to submit the dispute to arbitration. *See AT & T Techs., Inc. v. Communications Workers of Am.,* 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) ("Arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to so submit."). Thus, the question before me is whether Press agreed to arbitrate claims such as the Raethers'.

## A. The Arbitration Agreement

When Press became a registered representative of PCM, he completed a Uniform Application for Securities Industry Registration, otherwise known as a Form U–4. The form, which Press signed on June 21, 1991, included the following provision,

> I agree to arbitrate any dispute, claim or controversy that may arise between me and my firm, or a customer, or any other person, that is required to be arbitrated under the rules, constitutions or by-laws of the organizations indicated in item 10 as may be amended from time to time and that any arbitration award rendered against me may be entered as a judgment in any court of competent jurisdiction.

(R. 17 Ex. D at 4.) The rules referred to in the form include the Rule 10100 Series of the NASD Code, which detail the arbitration requirements. Rule 10101 of the NASD Code, entitled "Matters Eligible for Submission" provides in pertinent part,

> This Code of Arbitration Procedure is prescribed and adopted . . . for the arbitration of any dispute, claim or controversy arising out of or in connection with the business of any member of the Association . . . between or among members of associated persons and public customers or others . . . .

(R. 23 Ex. A.) Rule 10301(a) entitled "Required Submission" states,

> Any dispute, claim, or controversy eligible for submission under the Rule 10100 Series between a customer and a member and/or associated person arising in connection with the activities of such associated persons shall be arbitrated

---

**1.** The Raethers have also offered evidence of criminal proceedings against Press and others affiliated with PCM and evidence that Press was found liable in another arbitration proceeding arising out of his involvement with PCM. Press has objected to this evidence on the grounds that it is highly prejudicial and irrelevant. I agree and, thus, do not consider it in deciding the motions before me.

under this Code, as provided by any duly executed and enforceable written agreement or upon the demand of the customer.

(*Id.* Ex. B. at 1.) The parties agree that these documents together comprise the arbitration agreement at issue in this case.

## B. Appropriate Forum for Determining Arbitrability

As an initial matter, I must address whether this court or the arbitrator should decide the arbitrability of the parties' dispute. The Supreme Court has stated that "[u]nless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *AT & T Techs.*, 475 U.S. at 649, 106 S.Ct. 1415; *J.E. Liss & Co. v. Levin*, 201 F.3d 848, 851 (7th Cir.2000) ("[C]ourts decide issues of arbitrability unless the parties have clearly indicated that the arbitrators are to decide them."). Here, both parties assert that they have not clearly indicated that the arbitrator should decide the issue. Thus, the court is the appropriate forum and the issue of arbitrability is properly before me. *See Miller v. Flume*, 139 F.3d 1130, 1134 (7th Cir.1998) (holding in case interpreting NASD arbitration provisions that arbitrability question was for court to resolve).

## C. Applicable Law

State law governs the question of whether the parties agreed to arbitrate. *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687–88, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996); *Perry v. Thomas*, 482 U.S. 483, 492 n. 9, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987). In the present case, Wisconsin law and New York law are potentially applicable because the Raethers live in Wisconsin and the agreement was allegedly formed in New York. However, the relevant law in Wisconsin and New York is similar in that the court is directed to ascertain the intent of the parties from the language of the relevant documents. *Breed v. Ins. Co. of N. Am.*, 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 385 N.E.2d 1280 (1978); *Patti v. Western Mach. Co.*, 72 Wis.2d 348, 351, 241 N.W.2d 158 (1976). Where the law of two states is essentially the same, I apply the law of the forum. *Ry. Express Agency v. Super Scale Models, Ltd.*, 934 F.2d 135, 139 (7th Cir.1991). Thus, I apply Wisconsin law to the question of whether an arbitration agreement was formed.

As to the question of what law governs the scope of an arbitration agreement, there is considerable confusion among the courts. Some courts have said that the Federal Arbitration Act empowers federal courts to create a federal common law of contract interpretation. *See, e.g., John Hancock Life Ins. Co. v. Wilson*, 254 F.3d 48, 58 (2d Cir.2001); *Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 170 F.3d 1, 19 (1st Cir.1999); *Manuel v. Honda R&D Ams., Inc.*, 175 F.Supp.2d 987, 989 (S.D.Ohio 2001); *see also* Note, *An Unnecessary Choice of Law: Volt, Mastrobuono and Federal Arbitration Act Preemption*, 115 Harv. L.Rev. 2252 (June 2002). However, the Supreme Court has said that the Federal Arbitration Act leaves in place state contract law so long as such law treats arbitration agreements like other contracts. *Doctor's Assocs.*, 517 U.S. at 685–88, 116 S.Ct. 1652. Thus, in the absence of a Supreme Court or Seventh Circuit decision to the contrary, I conclude that state law also governs the interpretation of the scope of such agreements. As to the question of which state law applies, my analysis is the same as above. Both Wisconsin law and New York law treat arbitration agreements like other contracts in all respects relevant here; therefore, I apply Wisconsin law.

However, the Supreme Court has said that the Federal Arbitration Act federalizes the interpretation of arbitration clauses in one respect. As a matter of federal law, the existence of an arbitration clause creates a presumption of arbitrability. If the contract's arbitration clause is ambiguous, federal law compels me resolve the ambiguity in favor of arbitration. *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995); *Miller*, 139 F.3d at 1136. I must find the dispute arbitrable unless "it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT & T Techs.*, 475 U.S. at 650, 106 S.Ct. 1415 (internal citations and quotation marks omitted).

### D. Interpretation of Agreement

To interpret the agreement, I begin with the plain language of the relevant provisions. The parties agree that in order to be required to arbitrate the dispute, the dispute must fall within the scope of NASD Rule 10301(a): the dispute must be between a "customer and ... associated person" and must "aris[e] in connection with the activities of such associated person[ ]". (R. 23 Ex. B. at 1.) Here, the parties agree that the Raethers are "customer[s]". However, the parties disagree over (1) whether Press was an "associated person" during the time that the Raethers' did business with PCM, (2) whether Press conducted "activities", and (3) whether the Raethers' claims "aris[e] in connection with" those activities. Whether Press is an "associated person" involves whether the parties entered an agreement, a question of state contract law. Whether he engaged in "activities" and whether the claims "arise in connection" with the activities address the scope of the arbitration clause, also a question of state contract law, except to the extent the clause is ambiguous. I address these contract terms one at a time.

### 1. "Associated Person"

The NASD By–Laws define an "associated person" as:

(1) a natural person who is registered or has applied for registration under the Rules of the Association; [or]

(2) a sole proprietor, partner, officer, director, branch manager of a member [of the NASD], or other natural person occupying a similar status or performing similar functions, or a natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by a member, whether or not any such person is registered or exempt from registration with the NASD ....

NASD By–Laws, Art. I., ¶ (dd); *see also Miller*, 139 F.3d at 1135. "Under the NASD By–Laws, anyone who signs a Form U–4, is an 'associated person' ". *Jin v. Metro. Life Ins.*, No. 95 CIV. 4427, 2000 WL 347150, at *3 (S.D.N.Y. Apr. 4, 2000).

Here, the parties agree that Press signed a Form U–4. Thus, he "registered ... under the Rules of the Association" and was, at some point, an "associated person". Press argues that he lost that status on July 7, 1997 when he gave up his NASD registration. However, I need not address that issue, because Press also meets the second definition of an "associated person", which does not require the party to have registered with the NASD.

Under the second definition, a person is an "associated person" if he or she "occup[ies] a similar status or perform[s] similar functions" to "a sole proprietor, partner, officer, director [or] branch manager of a member". NASD By–Laws, Art. I., ¶ (dd). This provision by its plain language is broad, showing that the parties

intended to reach beyond corporate shells and titles to cover those who have informal, but significant relationships to NASD members.

Whether Press meets this definition depends upon his relationship to PCM. Here, Press maintained close ties to PCM. And taken as a whole, the undisputed evidence reveals that Press "occup[ied] a similar status or perform[ed] similar functions" to a PCM manager, director or officer during the period at issue in this lawsuit. I turn to the evidence.

First, Press owned half of Performance Capital which, until April 17, 1996, owned and operated PCM. Thus, until that date, Press was himself an officer or director of PCM.

Second, after April 17, 1996, when Performance Capital sold its interest in PCM, Press was still half-owner of Performance Capital, which continued to operate PCM. The management agreement shows that Performance Capital was very much in charge, despite the fact that it was no longer PCM's legal owner. Under the agreement, Performance Capital "overs[aw] the day to day operations of PCM, including compliance and personnel matters", and maintained "final decision making authority" with regard to compliance and "direct supervisory control" over PCM's staff. (R. 17 Ex. B. 1.) It is difficult to imagine how Performance Capital could have had much more control over PCM. Thus, Press, as Performance Capital's half-owner, maintained "a similar status" to a PCM officer or director.

The facts surrounding the Performance Capital—Mitchell Financial Corp. relationship further show that Press's position as half-owner of Performance Capital was similar to that of a member director, officer or manager. Mitchell Financial Corp., although technically the owner, did not have the necessary license to supervise brokers and thus could not operate PCM on its own. Performance Capital's management was essential. In addition, for Performance Capital, managing PCM was sufficiently important that Performance Capital made it a condition of the sale and bound itself to PCM for four years. Moreover, Performance Capital received 90% of commissions plus an annual fee. Thus, even after the sale, Performance Capital's financial interest in PCM was substantial.

Third, the evidence conclusively shows that Press personally continued to have some involvement in the management of PCM. Press "functioned as" a PCM officer, manager or director on at least several occasions. He participated in the interviewing of Elliot Gayer for the position of PCM director of compliance. Interviewing a candidate for a director position is a function similar to that of a member officer, director or manager.

Press does not dispute that he participated in the interview but states that he was present "in large measure as a personal gesture to Mr. Edelson, who was experiencing serious health difficulties at that time". (R. 25 ¶ 10.) However, this explanation only further shows that Press's functions were similar to those of a PCM manager, officer or director. Edelson was the on-site PCM manager and chief compliance officer and, thus, plainly an "associated person" of PCM. By stepping in to assist Edelson, Press performed Edelson's duties and, thus, functioned as a manager, director or officer. Whether Press was motivated by his personal relationship with Edelson or by his ownership interest in Performance Capital is immaterial. The issue is the nature of his function, which was clearly that of a manager, officer or director.

Press also states that he was present at the interview because he "wanted to make

sure that he [Edelson] and the broker-dealers were going to receive the assistance that was needed from additional compliance personnel." (*Id.*) This statement also illustrates Press's concern for the management of PCM, concern that led him to assist Edelson in managing PCM's operations, at least on an ad hoc basis.

In addition to participating in the interview, Press along with Edelson, later met with Gayer, urged him to withdraw his recommendation that Pizzolato be fined $5,000, and informed Gayer that they wanted to run a "broker-friendly" department by preventing problems rather than fining brokers. This evidence shows that Press had a role in setting PCM policy with regard to compliance and in communicating that policy to PCM's compliance director. These functions are clearly similar, if not identical to, those of a PCM manager, officer or director. Indeed, Gayer testified that in communicating this information, Press represented himself as a PCM decision-maker and said the same things as Edelson, who was a PCM director.

Once again, Press does not dispute that this conversation with Gayer took place. He states that although he cannot recall any specific conversations, "because Mr. Edelson was the principal compliance officer of PCM [ ] and was then an old friend and business partner, I am certain, if for some reason consulted, that I would have indicated my complete support for whatever instructions were given by Mr. Edelson to PCM[ ] personnel." (*Id.* at ¶ 11.) However, these statements raise no factual dispute as to whether Press told Gayer how to address compliance problems at PCM.

The first statement, that Press cannot remember any specific conversations, creates no genuine factual dispute. In order to raise a dispute sufficient to withstand summary judgment, a party must offer evidence "set[ting] forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Press offers no specific facts. He does not even deny that the conversation occurred; he merely says he cannot remember. Thus, his statement is insufficient to meet the Rule 56(e) standard. Moreover, Rule 56(e) aside, Press's statement that he cannot remember could not lead a reasonable fact-finder to find that Press did not communicate compliance policy to Gayer or represent to Gayer that he was a PCM decision-maker.

Press's second statement, that he probably would have supported Edelson, also creates no genuine factual dispute. To raise a genuine dispute for trial, a party must offer facts. Press's statement is wholly speculative. Speculations about what he might have said are insufficient to satisfy Rule 56(e). *See Stagman v. Ryan,* 176 F.3d 986, 995 (7th Cir.1999) (stating that statements based on speculation do not meet Rule 56(e) standard). They likewise could not lead a rational fact-finder to reject Gayer's testimony about what Press said. Thus, Press's arguments are unavailing.

Taken as a whole, Press's status as the half-owner of the company that operated PCM and the undisputed evidence that Press maintained some management control, even if on an ad hoc basis, considered in light of the fact the Press's company formerly owned PCM, would certainly compel a reasonable fact-finder to find that Press "occup[ied] a similar status or perform[ed] similar functions" to a PCM manager, officer or director. Thus, Press was an "associated person" at all relevant times.

In response, Press argues that the Raethers' arbitration complaint attempts to hold him personally liable for Performance Capital's acts and that he cannot be

held liable unless the Raethers can prove the required elements to permit the court to pierce the corporate veil. However, the question before me is not whether Press is liable or even whether Press could be held liable to the Raethers. The question here is whether Press agreed to arbitrate disputes such as this one. If so, the arbitrator must determine whether and to what extent Press can be held liable. Thus, Press's argument is rejected.

Because Press is an "associated person," I conclude that he is bound by the arbitration agreement. However, in order to be forced to arbitrate, the Raethers' claims must fall within the agreement's scope. Thus, I address the two remaining terms.

### 2. "Activities"

■ Under the agreement, in order to be arbitrable, the dispute must concern "activities". The NASD Rules do not define the word. Press argues that the parties intended that "activities" be limited to securities-related activities, and cites to *Foy v. Thorp*, 186 Ariz. 151, 920 P.2d 31 (Ct.App.1996), where an Arizona court of appeals so held.

However, even assuming that Press's narrow interpretation of the word "activities" is correct, Press engaged in securities-related activities and thus, cannot escape application of the arbitration agreement on this ground. As discussed above, Press was involved in interviewing PCM's director of compliance, Elliot Gayer, and assisted Edelson in communicating PCM's compliance monitoring policy to Gayer. These activities were securities-related because they addressed whether and how PCM monitored itself when engaging in the process of buying

and selling securities.[2] Thus, Press's argument is unavailing.

*Foy v. Thorp* does not suggest a different result. In *Foy,* the dispute arose out of a real estate investment which failed to meet the definition of a security; thus, the dispute could not be securities-related because there was no security at all. *Foy,* 920 P.2d at 36–38. Thus, even if *Foy* were binding on me, it would not compel me to find that Press's activities were outside the scope of the arbitration provision.

### 3. "Arising in connection with . . ."

■ The final issue to be addressed is whether the claims in the Raethers' arbitration complaint "aris[e] in connection with" Press's activities. I note that once again, the language of the provision is broad, "sweeping in not only claims that literally 'arise out of'" Press's activities, "but also claims that have a 'connection' with" those activities. *Miller,* 139 F.3d at 1136 (interpreting the same NASD provision). Indeed, terms such as "in connection with" are typically interpreted to mean that the parties intended their arbitration provision to be expansive. *See, e.g., Nauru Phosphate Royalties, Inc. v. Drago Daic Interests, Inc.,* 138 F.3d 160, 164–65 (5th Cir.1998) (holding that when parties agree to an arbitration clause governing "[a]ny dispute . . . arising out of or in connection with or relating to this Agreement," they "intend the clause to reach all aspects of the relationship."); *Tracer Research Corp. v. Nat'l Envt'l Servs. Co.,* 42 F.3d 1292, 1295 (9th Cir. 1994) (stating that language like "relating to" indicates a broad arbitration clause); *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.,* 863 F.2d 315, 321 (4th Cir.

---

**2.** Press also conducted trades in his own account and for friends and family until July 1997. Trading in securities is also clearly a securities-related activity. However, because the Raethers' claims did not "aris[e] in connection with" this trading, I do not address this evidence.

1988) (holding that language "arising in connection with" indicated an expansive arbitration clause).

Here, the Raethers' claims have a connection with Press's activities. The Raethers allege in their arbitration complaint that PCM "encouraged [its brokers] to disregard their duty of fair dealing to investors and to mislead investors during the offer, purchase and sale of securities". (R. 17 Ex. C ¶ 2.) As discussed above, Press participated in the interview to select a compliance director, whose job it would be to try to prevent the abuses that the Raethers allege. Press also told Gayer how to operate his department, to be "broker-friendly," and not to fine brokers for violations. Thus, the Raethers' claims about rampant broker misconduct in violation of securities law have a clear connection to Press's activities. The plain language of the clause encompasses the Raethers' claims.

However, even if I were to find that "arising in connection with" were an ambiguous term and that its scope presented a closer question, I would be compelled to find that the arbitration clause covers the claims in the Raethers' complaint. In determining the scope of an arbitration clause, federal law compels me to resolve "any doubts ... in favor of arbitration." *Miller*, 139 F.3d at 1136. I should find the dispute arbitrable unless "it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT & T Techs*, 475 U.S. at 650, 106 S.Ct. 1415. No rational fact-finder could positively say that the Raethers' claims do not arise in connection with Press's activities. Thus, Press must arbitrate the Raethers' claims.

## V. CONCLUSION

For the foregoing reasons, the Raethers' claims against Press are arbitrable as a matter of law. Because the Raethers' motion for summary judgment must be granted, it follows that Press's must be denied.

**THEREFORE IT IS ORDERED** that plaintiff Press's motion for summary judgment is **DENIED**, defendants the Raethers' motion for summary judgment is **GRANTED** and the case is **DISMISSED**.